IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HEATHER MARIE WEST, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| NANCY A. BERRYHILL, | : | |
| Acting Commissioner of Social Security, | : | |
| Defendant. | : | No. 17-00249 |

**OPINION**

**LINDA K. CARACAPPA**
**UNITED STATES CHIEF MAGISTRATE JUDGE**

Plaintiff, Heather Marie West, brought this action under 42 U.S.C. § 405(g), seeking

judicial review of the final decision of the Commissioner of Social Security ("Commissioner")

denying plaintiff's claims for disability insurance benefits ("DIB") under Title II of the Social

Security Act ("Act") and Supplemental Security Income ("SSI") under Title XVI of the Act.

Presently before this court are plaintiff's request for review, the Commissioner's response, and

plaintiff's reply.  For the reasons set forth below, plaintiff's request for review be denied.

I.       FACTUAL AND PROCEDURAL HISTORY

Plaintiff was born on January 19, 1977 and was thirty-five (35) years old on the

alleged disability onset date. (Tr. 31).  Plaintiff completed high school and has past relevant work

experience as a construction worker, van driver, and security guard. (Tr. 30-31).

On September 25, 2012, plaintiff protectively filed applications for DIB and SSI,

alleging disability beginning on August 15, 2012. (Tr. 18).  The applications were denied at the

state level on November 27, 2012. Id.  Plaintiff subsequently requested a hearing before an

Administrative Law Judge ("ALJ"). Id.

On April 2, 2014, ALJ Craig De Bernardis held a hearing and heard testimony from an impartial vocational expert. (Tr. 18). The ALJ also ordered a consultative psychiatric evaluation of the plaintiff. Id. On September 10, 2014, the ALJ held a hearing and heard testimony from the plaintiff, who was represented by counsel. Id. Dr. Philip Braun, a medical expert in psychology and an impartial vocational expert were also present, but did not testify. Id. The ALJ ordered a consultative orthopedic examination of the plaintiff. On April 8, 2015, the ALJ held a hearing and heard testimony from the plaintiff, Dr. Braun and an impartial vocational expert. Id.

On June 2, 2015, the ALJ issued an opinion finding that plaintiff was not disabled under the Act from August 15, 2012 through the date of the decision. (Tr. 18-32). Plaintiff filed a request for review, which was denied by the Appeals Council on November 17, 2016, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-5). Plaintiff appealed that decision to this court. On August 24, 2017, the case was referred to the undersigned magistrate judge for the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

II.     LEGAL STANDARDS

Upon judicial review, this court's role is to determine whether the ALJ's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Pierce v. Underwood, 587 U.S. 552 (1988). "Substantial evidence is more than a mere scintilla but may be somewhat less than a preponderance of the evidence." Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005). It is relevant evidence viewed objectively as adequate to support a decision. Richardson v. Perales, 402 U.S. 389, 401 (1971). In determining whether substantial evidence exists, the reviewing

court may not weigh the evidence or substitute its own conclusion for that of the ALJ.  Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002).  If the court determines the ALJ's factual findings are supported by substantial evidence, the court must accept the findings as conclusive. Richardson, 402 U.S. at 390; Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).  It is the ALJ's responsibility to resolve conflicts in the evidence and to determine credibility and the relative weights to be given to the evidence.  Richardson, 402 U.S. at 401.  While the Third Circuit Court of Appeals has made it clear that the ALJ must analyze all relevant evidence in the record and provide an explanation for disregarding evidence, this requirement does not mandate that the ALJ "use particular language or adhere to a particular format in conducting his analysis." Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004).  Rather, it is meant "to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." Id.  Moreover, apart from the substantial evidence inquiry, a reviewing court must also ensure that the ALJ applied the proper legal standards.  Coria v. Heckler, 750 F.2d 245 (3d Cir. 1984).

To establish a disability under the Act, a claimant must demonstrate there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period."  Stunkard v. Sec'y of Health and Human Servs., 841 F.2d 57 (3d Cir. 1988) (quotation omitted); 42 U.S.C. § 423(d)(1) (1982).  The claimant satisfies his burden by showing an inability to return to his past relevant work.  Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986); Rossi v. Califano, 602 F.2d 55, 57 (3d Cir. 1979).  Once this showing is made, the burden of proof shifts to the Commissioner to show the claimant, given his age, education, and work experience, has the ability to perform specific jobs that exist in the economy.  20 C.F.R. § 404.1520.  See Rossi, 602 F.2d at 57.

As explained in the following agency regulation, each case is evaluated by the

Commissioner according to a five-step process:

> (i) At the first step, we consider your work activity if any.  If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairment(s).  If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (references to other regulations omitted).

III.    ADMINISTRATIVE LAW JUDGE'S DECISION

Pursuant to the five-step sequential evaluation process, the ALJ determined plaintiff had not been under a "disability," as defined by the Act from August 15, 2012 through June 2, 2015, the date of the ALJ's decision. (Tr. 18-32).

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since August 15, 2012, the alleged onset date. (Tr. 20).  At step two, the ALJ found that plaintiff had the following severe impairment: disorder of the spine; affective disorder; anxiety-related disorder.  In making this determination, the ALJ relied on plaintiff's medical records.

The court has reviewed the medical records and finds that the ALJ's summary of the medical records is in depth and inclusive of all pertinent records. The ALJ's summary is as follows:

DISORDER OF THE SPINE

On April 13, 2010, the [plaintiff] alleged that she had back pain, which "began back in 2007." (Exhibit 23F at 35). According to the [plaintiff], the pain involved "her hips, legs, low back and even sometimes her neck." (Id.) The [plaintiff] took "one Percocet yesterday given to her by her friend…." (Id.) The [plaintiff] "ambulates with a non-antalgic gait." (Exhibit 23F at 36). She had normal muscle strength in her upper and lower extremities. (Id.) The physician's assistant who examined the [plaintiff] ordered a magnetic resonance imaging (hereinafter "MRI") study. (Id.)

An MRI of the [plaintiff's] lumbar spine performed on May 24, 2010, showed "no disc herniation." (Exhibit 9F at 11). There was also "no central or neural foraminal stenosis." (Id.) "There is a small to moderate central disc herniation at the T10-11 level, which extends inferiorly along the posterior aspect of the upper T11 vertebral body. This abuts the ventral aspect of the spinal cord without significant central spinal stenosis or cord compression." (Id.)

A pain management specialist gave the [plaintiff] injections in her thoracic spine on October 8, 2010, and November 1, 2010. (Exhibit 23F at 27, 29, 33). The [plaintiff] said that the injections provided "30% relief of her pain." (Exhibit 23F at 26). The pain management specialist also gave the [plaintiff] Vicodin for her alleged pain. (Id.)

On November 23, 2010, the pain management specialist gave the [plaintiff] a third epidural injection in her thoracic spine. (Exhibit 23F at 25). He renewed the prescription of Vicodin. (Id.)

The [plaintiff] returned to see the pain management specialist on May 18, 2011. (Exhibit 23F at 23). "She ran out of her medications a long time ago. She does continue to work driving for Bucks County Transport, although she is no longer in a bus. She is now in a minivan, which helps her with her pain issues. It is a smoother drive. (Id.) The range of motion of the [plaintiff's] lumbar spine was "normal." (Id.) There was no sign of lumbar radiculopathy. (Id.) The physician's assistant renewed the prescription of Vicodin and recommended that the [plaintiff] undergo physical therapy. (Id.)

Dr. Sanjay Shah gave the [plaintiff] a lumbar epidural injection on June 1, 2011, despite the fact that there was no evidence of disorder in her lumbar spine. (Exhibit 23F at 21). "[Dr. Shah] [felt] that there [was] some inflammation in this [lumbar] area that is contributing to [plaintiff's] low back pain symptoms." (Id.)

On June 15, 2011, the [plaintiff] said that she had "50% relief of her lower lumbar pain." (Exhibit 23F at 19). In response to the [plaintiff's] complaint of pain in her thoracic spine, Dr. Shah gave [plaintiff] another epidural injection in that area. (Id.)

When the [plaintiff] alleged on August 4, 2011, that the lumbar injection failed to provide her with significant relief, Dr. Shah gave [plaintiff] "bilateral medial branch blocks" in her lumbar spine. (Exhibit 23F at 16). On August 11, 2011, Dr. Scott E. Rosenthal gave the [plaintiff] medial branch rhizotomies in her lumbar spine. (Exhibit 23F at 15). "[Plaintiff] underwent her second rhizotomy on the left low back on September 1, 2011." (Ehxibit 23F at 14). The [plaintiff] said it provided her with "50% improvement of her low back pain." (Id.) [Plaintiff] denied "any side effects" of her medications, which included Oxycodone and other narcotics. (Exhibits 23F at 14, 13, 9). The range of motion in the [plaintiff's] lumbar spine was "almost normal." (Exhibit 23F at 14). "She ambulates in a non-antalgic gait." (Exhibit 3F at 14, 9). There was no weakness in the [plaintiff's] legs. (Exhibits 23F at 12).

The [plaintiff] continued to work as a driver on November 23, 2011. (Exhibit 23F at 11, 10). [Plaintiff's] pain medications "cut her pain in half and [allowed] her to function." (Exhibit 23F at 9; 9F at 10.) She walked without a limp. (Exhibit 23F at 9; 9F at 10).

The [plaintiff] complained of increased pain on April 18, 2012. (Exhibit 23F at 8; 9F at 9). Muscle strength in her legs, however, was normal (Exhibit 23F at 8; 9F at 9). There were no neurological deficits and no sign of radiculopathy. (Exhibit 23F at 8; 9F at 9). "[Plaintiff] [continued] on Oxycodone." (Exhibit 23F at 8; 9F at 9). In response to the [plaintiff's] allegation of pain, Dr. Shah gave the [plaintiff] a lumbar steroid injection on April 24, 2012. (Exhibit 23F at 6; 9F at 7). [The injection] enabled [plaintiff] to continue working as a driver. (Exhibit 23F at 4, 5). [Plaintiff] was "also walking better" on May 15, 2012. (Exhibit 23F at 4, 5; 9F at 6). [Plaintiff's] pain lessened and the [plaintiff] had "no side effects of medications." (Exhibit 23F at 4, 5; 9F at 6).

Dr. Shah gave the [plaintiff] lumbar steroid injections on July 19, 2012, and October 5, 2012. (Exhibit 23F at 3; 14F at 12; 9F at 2, 4). "It helped about 40%, but … only lasted about one week." (Exhibit 14F at 12; 16F at 9). The physician's assistant prescribed MS Contin for the [plaintiff's] alleged pain. (Id.) The [plaintiff] said that MS Contin "does seem to help moderating her pain." (Exhibit 14F at 11). "In particular, [plaintiff] states the morning that [plaintiff] takes her Oxycodone and MS Contin together she is able to help get her children ready for school and does not experience any side effects on the current regimen." (Id.)

On February 4, 2013, in response to the [plaintiff's] allegation of increased pain, Dr. Rosenthal increased "the morphine MS Contin" and continued the prescription of Oxycodone. (Exhibit 14F at 10). The [plaintiff] alleged that she

spent most of the day in bed because of pain. (Id.) She was "ambulating with a cane." (Id.)

Increased morphine "helped" the [plaintiff] with her alleged pain, "in particular during her more active period in the morning." (Exhibit 14F at 9). Despite the [plaintiff's] complaint of "heartburn" and vomiting at night, Dr. Rosentahl continued to prescribe Oxycodone. (Id.) Since the [plaintiff's] insurance would not pay for MS Contin, Dr. Rosentahl prescribed Kadian. (Id.) He advised the [plaintiff] "to avoid eating late at night." (Id.)

The [plaintiff] had no side effects of medications on March 18, 2013. (Exhibit 14F at 8). The [plaintiff] asked Dr. Shah for a lumbar steroid injection, which he provided. (Id.) On April 4, 2013, the [plaintiff] said it "greatly improved her pain." (Exhibit 14F at 7). The [plaintiff] said that she "has been more active. She believes the injection did help her to do that, and has been trying to resume her old lifestyle. She denies side effects [of] her medication." (Id.) Dr. Shah continued the [plaintiff's] medications. (Id.) "I did encourage her to get outside and try to walk a little as tolerated. …" (Id.)

On May 2, 2013, the [plaintiff] was "doing well." (Exhibit 14F at 6). "[Plaintiff] feels a little better. She has been getting back to daily activities." (Id.) The [plaintiff] denied side effects of her medication. (Id.) Dr. Patrick Fall gave the [plaintiff] a lumbar steroid injection. (Exhibit 14F at 5). The [plaintiff] said that this injection provided her with "80% relief for two months." (Exhibit 14F at 5).

The [plaintiff] continued to receive prescription of Kadian and Oxycodone on November 4, 2013. (Exhibit 14F at 13; 35F at 21). [Plaintiff] asked for another lumbar injection on November 27, 2013 which Dr. Shah gave her because of "post laminectomy syndrome." (Exhibit 14F at 4; 35F at 20). The [plaintiff] never had a laminectomy. The [plaintiff] said that this injection gave her "70% relief," which continued as of January 7, 2014, when Dr. Shah gave her a left trochanteric bursa injection. (Exhibit 14F at 3; 35F at 19). He did so because the [plaintiff] alleged that she had "some left hip and left trochanteric bursal pain." (Exhibit 14F at 3; 35F at 19).

There was no imaging study of the [plaintiff's] hip. (Exhibit 26F at 4). One was not done until February 2014, but was not reviewed as of March 12, 2014. (Id.) In fact, when an x-ray of the [plaintiff's] hips was finally reviewed on March 28, 201[4], there was "no evidence of osteoarthritis." (Exhibit 26F at 3; 35F at 16). Another study of the [plaintiff's] left hip on February 28, 2014, was also within normal limits. (Exhibit 38F at 3; 31F at 67). Nevertheless, when the [plaintiff] asked for another hip injection on March 28, 2011, Dr. Shah gave her one. (Exhibit 38F at 3; 31F at 67).

On February 11, 2014, the [plaintiff] said that the hip injection gave her "50% relief" of her pain. (Exhibit 26F at 5; 35F at 18). She had no side effects of

medication. (Exhibit 26F at 5; 35F at 18). She continued to receive prescription[s] for Kadian and Oxycodone. (Id.) Her gait was "normal." (Exhibit 26F at 5; 35F at 18).

The [plaintiff's] gait was "normal" on March 12, 2014. (Exhibit 24F at 4; 35F at 17). The physician's assistant gave the [plaintiff] a three-month supply of Kadian and Oxycodone because of "post laminectomy syndrome." (Exhibit 24F at 4; 35F at 17).

The [plaintiff's] gait continued [to be] "normal" on May 12, 2014. (Exhibit 24F at 2; 35F at 15). In response to the [plaintiff's] complaint of lower back pain, the physician's assistant continued to prescribe Kadian and Oxycodone because of "post laminectomy syndrome." (Exhibit 24F at 2; 35F at 15). She did the same on June 9, 2014. Exhibit 24F at 1; 35F at 14). The [plaintiff] never had a laminectomy.

On August 27, 2014, Dr. Shah gave the [plaintiff] another lumbar injection based upon his diagnosis of post laminectomy syndrome. (Exhibit 35F at 12). His assistant allowed the [plaintiff] to have Oxycodone on October 6, 2014, for her complaint of lower back pain. (Exhibit 25F at 11; 27F at 8). The [plaintiff's] gait was "normal." (Id.) there was no weakness in [plaintiff's] legs. (Id.) [Plaintiff] had no vertigo or headaches. (Id.) The [plaintiff] had no side effects of medication. (Id.)

The [plaintiff] obtained another lumbar steroid injection on October 28, 2014. (Exhibit 35F at 9). She had "no unusual pain in muscles or joints," and "no paresthesias or numbness." (Id.) There was no weakness or ataxia. (Id.) The [plaintiff] had normal strength and sensation in her legs. (Id.) She had no weakness or numbness in her lower extremities, no headaches, and no side effects of medication. (Exhibit 37F at 8).

On December 3, 2014, the physician's assistant increased the use of Fentanyl because the [plaintiff] complained of "whole body pain." (Exhibit 35F at 7, 8). The [plaintiff] had no vertigo or headaches. (Exhibit 35F at 7). She had "no unusual pain in muscles or joints." (Id.) There was no ataxia, but the [plaintiff] was using a cane. (Id.)

The [plaintiff] obtained another injection in her hip on December 18, 2014. (Exhibit 35F at 5, 6). [Plaintiff alleged that she had pain in her hip with walking or standing. (Exhibit 35F at 5). There was no ataxia or weakness in the [plaintiff's] legs. (Id.) She had "no unusual pain in muscles or joints." (Id.)

On February 3, 2015, the [plaintiff] had no side effects of medication. (Exhibit 25F at 3; 37F at 3). [Plaintiff] had "30% relief "of pain in her hip. (Exhibit 25F at 3; 37F at 3). There was no ataxia. (Exhibit 25F at 3; 37F at 3). Dr. Shah said that the [plaintiff] had "significant relief" of pain with lumbar injections. (Exhibit 35F

at 2). On February 11, 2015, [Dr. Shah] gave the [plaintiff] another such injection. (Id.)

POSSIBLE TRANSIENT ISCHEMIC ATTACK:

The [plaintiff] was in the hospital from July 31, 2014, until August 2, 2014. (Exhibit 31F at 3). She "came into the hospital…because she experience triplopsis (triple vision)." (Exhibit 31F at 11). The plaintiff had no eye pain. (Id.) The triple vision "went away." (Id.)

The [plaintiff] also alleged that she had "numbness in the arms chronically" and "chronic headaches." (Exhibit 31F at 11). When [Dr. Schneidman] learned that [plaintiff] "[was] on morphine," [he] attributed [plaintiff's] sensory changes "to drug [a]ffect." (Id.)

By August 1, 2014, the [plaintiff] "is completely back to her usual self. She is feeling well now." (Exhibit 31F at 11). [Plaintiff's] triple vision had resolved. (Exhibit 31F at 13).

The [plaintiff] previously was in the hospital from August 20, 2012, until August 22, 2012, complaining of vertigo. (Exhibit 31F at 11; 2F at 2, 57; 8F at 24, 27). [Plaintiff] complained of blurriness in her left eye. (Exhibit 8F at 29; 3F at 3). "[Plaintiff] had dense left hemisensory deficit." (Id.) An MRI of [plaintiff's] brain in 2012 showed a "tiny" aneurysm. (Exhibit 31F at 11; 16F at 12, 13, 15, 16; 2F at 112, 113). [Plaintiff's] middle ear function was within normal limits. (Exhibit 16F at 17; 7F at 13; 4F at 1). There was no stenosis of the [plaintiff's] carotid artery. (Exhibit 16F at 10; 2F at 115). Another MRI of [plaintiff's] brain during her hospitalization in 2014 showed "no change" in the aneurysm. (Exhibit 31F at 11, 69).

The discharge summary on August 2, 2014, stated that [plaintiff's] primary diagnosis was transient ischemic attack, but an imaging study of the [plaintiff's] brain showed "no evidence of mass hemorrhage, or acute infarction." Exhibit 31F at 5, 72; 16F at 14). Her motor strength, sensory ability, and speech were all "normal." (Exhibit 31F at 71). While a transient ischemic attack was "possible," there was also the possibility that the [plaintiff] had [a] viral syndrome or an "ophthalmological problem." (Exhibit 31F at 35).

Investigation of the [plaintiff's] eyes provided no explanation for her allegation of numbness on her left side, vertigo, headache, and loss of vision in her left eye. (Exhibit 30F; 17F at 22). Dr. Mark L. Moster, an ophthalmologist, reported on September 25, 2012, that "I do not find neuro-ophthalmologic cause for [the plaintiff's] visual blurring in the left eye." (Exhibit5F at 3). Dr. Moster saw no connection [between] [plaintiff's] visual condition [and] the [plaintiff's] alleged left-sided numbness. (Id.)

Dr. Raoul Biniaurishivili, a neurologist, examined the [plaintiff] on December 24, 2012, regarding her complaints of dizziness. (Exhibit 16F at 8).  There was no aphasia and no "comprehension deficit." (Id.) Cranial nerve examination was within normal limits. (Id.)  The [plaintiff's] muscle strength was normal. (Id.) Her "sensory is intact to all primary modalities." (Id.)  "Concentration tests are normal." (Id.)  Dr. Biniaurishivili made the same findings on June 6, 2013, October 2, 2013, and February 24, 2014. (Exhibit 16F at 3, 4, 6).

An electroencephalogram on February 19, 2013, was "normal." (Exhibit 16F at 7).

An imaging study of the [plaintiff's] brain was "really quite normal and there [were] no plaques or lesions seen," which would indicate multiple sclerosis. (Exhibit 17F at 23; 33F at 8). Dr. Anthony Rock, the [plaintiff's] primary care physician, suggested that [plaintiff] see a rheumatologist to determine whether she had fibromyalgia syndrome. (Exhibit 17F at 9). There is no evidence that [plaintiff] did so.

The [plaintiff] returned to the hospital on January 24, 2014, complaining of a headache and double vision. (Exhibit 15F at 4).  There was no change in her aneurysm. (Exhibit 15F at 15). There was no evidence of "mass, hemorrhage, or acute infarction" in the [plaintiff's] brain. (Exhibit 15F at 18).  The [plaintiff] "denied neck pain and back pain." (Exhibit 15F at 15).  [Plaintiff] had no visual changes or weakness. (Id.)  The [plaintiff] had "normal motor, normal sensory," and "normal speech." (Exhibit 15F at 16). [Plaintiff] had full range of motion in her upper and lower extremities. (Exhibit 15F at 16).

The [plaintiff] saw a neurologist on February 25, 2015, with "multiple neurologic and constitutional complaints." (Exhibit 39F at 3). Specifically, the [plaintiff] told the neurologist that she had "lower extremity numbness and weakness" and "chronic headaches." (Id.) [Plaintiff] also alleged that she had problems with her vision. (Id.) "Things go black and fade and [plaintiff] needs to adjust her eyes to see correctly." (Id.)  [Plaintiff's] peripheral vision is allegedly "poor." (Id.)

The neurologist noted that the [plaintiff's] physical examination was "normal," "with the exception[] of some 'functional components.'" (Exhibit 39F at 5). "[Plaintiff's] symptoms do not sound classic for multiple sclerosis." (Id.) Imaging studies of the [plaintiff's] brain did not show white matter lesions, indicative of multiple sclerosis. (Id.)

THE [PLAINTIFF'S] MENTAL CONDITION:

The [plaintiff] enrolled in outpatient mental health treatment on October 11, 2012. (Exhibit 13F at 11; 10F at 4). [Plaintiff] had difficulties with her children. (Exhibit 13F at 5).  The [plaintiff] alleged that she had been molested as a child. (Id.)  The [plaintiff] was depressed and anxious. (Exhibit 13F at 8).  [Plaintiff]

gave benign responses in mental status examination. (Exhibit 13F at 9). The [plaintiff] had a history of substance abuse. (Exhibit 13F at 10; 28F at 29). [Plaintiff] received a diagnosis of adjustment disorder with anxiety and depression. (Exhibit 13F at 11; 34F at 2). [Her provider] rated the symptoms as mild to moderate. (Id.)

On March 5, 2014, the [plaintiff] alleged that her energy level was "very low." (Exhibit 28F at 28; 19F; 18F). [Plaintiff] denied perceptual disturbances, but her mood "frequently" shifted to the "hypermanic level." (Id.)

On March 6, 2014, one day after the [plaintiff] had returned to mental health therapy after an absence of over one year, her therapist, Joseph Donnelly, "completed a mental capacity assessment for [the plaintiff's] disability." (Exhibit 28F at 25; 25F). He did so despite the psychiatrist's holding that the [plaintiff] had moderate symptoms of mental disorder. (Exhibit 28F at 31).

Despite certifying that the [plaintiff] had receptive communication delay and difficulty concentrating, Mr. Donnelly noted the [plaintiff's] problems with her boyfriends and dislike of psychotropic medication on March 20, 2014. (Exhibit 28F at 23, 24). On March 27, 2014, the [plaintiff] was anxious "over upcoming SSI case." (Exhibit 28F at 22).

On April 10, 2014, Mr. Donnelly noted that the [plaintiff] was "dating Kevin again" and "broke up with her ex-boyfriend." (Exhibit 28F at 19). The [plaintiff] continued to complain of depression and anxiety. (Id.)

The [plaintiff] told her psychiatrist on April 23, 2014, that she had "excessive sedation while on Klonopin." (Exhibit 28F at 15, 18; 27F at 5). [Plaintiff] alleged that she had mood swings and olfactory hallucinations. (Id.)

Mr. Donnelly noted on May 23, 2014, that the [plaintiff's] "relationship with her boyfriend is going well." (Exhibit 28F at 11, 15). The [plaintiff] complained to the police "48 times in the past year or so" regarding her neighbor. (Exhibit 28F at 9). [Plaintiff] was still anxious regarding her request for disability benefits. (Exhibit 28F at 9). The [plaintiff] continued to worry about this matter on June 18, 2014. (Exhibit 28F at 4). Mr. Donnelly rated the [plaintiff's] depression as "moderate." (Id.)

On July 3, 2014, Mr. Donnelly "worked on emotional regulation and cognitive reframing" with the [plaintiff]. (Exhibit 28F at 6). The [plaintiff] told her psychiatrist on July 10, 2014, that she had non-Hodgkin's lymphoma. (Exhibit 28F at 7; 27F at 1). In response, the psychiatrist discontinued treatment with Tegretol. (Exhibit 28F at 7; 27F at 1). Mr. Donnelly was still working on "reframing" the [plaintiff's] "cognitive thought processes" on July 24, 2014. (Exhibit 28F at 1).

The [plaintiff] was "all right" on October 13, 2014. (Exhibit 34F at 5). Although still depressed, the [plaintiff] complained of headaches. (Id.) [Plaintiff] received diagnoses of bipolar mood disorder and post-traumatic stress syndrome. (Exhibit 28F at 31). [Plaintiff's] psychiatrist rated her symptoms as moderate. (Id.)

On January 7, 2015, the [plaintiff] alleged that her anxiety and depression had increased "due to family relational problems." (Exhibit 34F at 4). Nevertheless, her treating source continued to rate the [plaintiff's] symptoms as moderate. (Exhibit 24F at 2, 3).

Continuing with the five-step sequential evaluation, at step three, the ALJ found plaintiff did not have an impairment that met or medically equaled one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 21).

At step four, the ALJ found plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b). (Tr. 22). The ALJ added the following restrictions: plaintiff can stand or walk for a total of two hours in an eight-hour workday; push or pull occasionally with her lower extremities; climb stairs or ramps occasionally; never climb ladders, ropes, or scaffolding. Id. Plaintiff can balance with one cane; stoop or knee occasionally; but, can never crouch or crawl. Id. Plaintiff can reach, handle, finger or feel frequently and could withstand temperature extremes, heights, vibration, or hazardous machinery, provided that she avoids concentrated exposure. Id. Plaintiff is unable to perform complicated tasks and can only engage in simple decision-making. Id. Plaintiff requires a stable work environment in which there are only occasional changes in work settings, tools and procedures. Id. Finally, although plaintiff has the occasional ability to interact with supervisors, co-workers and the public, she has occasional lapses in concentration, persistence, or pace. Id.

The ALJ expressed serious doubt regarding the intensity, persistence and limiting effects of plaintiff's symptoms for the reasons set out in the ALJ's decision. (Tr. 28-29).

Finally at step five, the ALJ determined plaintiff was unable to perform past relevant work. (Tr. 30).  However, the ALJ found that considering plaintiff's age, education, work experience, and residual functional capacity, plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. (Tr. 31-32). Thus, the ALJ determined that plaintiff had not been under a disability, as defined in the Act, from August 15, 2012, through June 2, 2015, the date of this decision. (Tr. 32).

IV.     PLAINTIFF'S CONTENTIONS

Plaintiff argues: (1) the ALJ's RFC determination is not supported by substantial evidence; and (2) the ALJ's determination at step five, is not supported by substantial evidence.

V.      DISCUSSION

The Commissioner's findings must be affirmed if they are supported by substantial evidence.  42 U.S.C. § 405(g); Richardson, 402 U.S. at 401.  The role of this court is to determine whether substantial evidence supports the Commissioner's decision.  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).  After review of the record, plaintiff's request for review is denied.

A.  Claim One: Whether the ALJ's RFC Determination was Supported by Substantial Evidence

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence.  Pl. Brief at 3-8.  Specifically, plaintiff argues that the ALJ failed to weigh the opinions of plaintiff's treating psychiatrist, Dr. Oyefule, treating therapist, Joseph Donnelly, M.S., and the state agency medical consultant, Dr. Marmar. Id.  The plaintiff also argues that the ALJ erred in giving no weight to the opinion of plaintiff's physician, Dr. Rock, due to the fact that he completed a checkmark form delineating plaintiff's abilities. Id.  In response, the Commissioner argues that the ALJ was not required to give substantial weight to Mr. Donnelly's opinion, as it

was inconsistent with the medical evidence.  Def. Resp. at 6-8.  Further, the Commissioner argues that the ALJ did not err in rejecting Dr. Marmar's opinion due to the fact that Dr. Marmar did not review the medical evidence and therefore lacked an understanding of plaintiff's ability to function. Def. Resp. at 9. Finally, the Commissioner argues that the ALJ was entitled to reject Dr. Rock's checklist based on long-settled case law in the Third Circuit. Def. Resp. at 8-9.

The regulations provide that an ALJ has the final responsibility in determining a claimant's residual functional capacity.  20 C.F.R. § 404.1546.  The residual functional capacity assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities despite the limitations caused by his or her impairment(s).  20 C.F.R. § 404.1545(a); see also Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000).  The ALJ must consider all the evidence of record, including medical signs and laboratory findings, daily activities, medical source statements, and a claimant's medical history.  SSR 96-8p; Mullin v. Apfel, 79 F. Supp. 2d 544, 548 (E.D. Pa. 2000).  An ALJ's residual functional capacity findings must be supported by the medical evidence.  Doak v. Heckler, 790 F.2d 26, 29 (3d Cir. 1986).  The ALJ is not bound by a treating physician's opinion of residual functional capacity and the ALJ is entitled to reject the opinion if there is a lack of supporting data in the record or the opinion is contrary to the medical evidence.  See Chandler, 667 F.3d at 361 (quoting Brown v. Astrue, 649 F.3d 193, 197 n. 2 (3d Cir. 2011)); see also Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985).

The ALJ found plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b).  (Tr. 22).  The ALJ added the following restrictions: plaintiff can stand or walk for a total of two hours in an eight-hour workday; push or pull occasionally with her lower extremities; climb stairs or ramps occasionally; never climb

ladders, ropes, or scaffolding. Id. Plaintiff can balance with one cane; stoop or kneel occasionally; but, can never crouch or crawl. Id. Plaintiff can reach, handle, finger or feel frequently and can withstand temperature extremes, heights, vibration, or hazardous machinery, provided that she avoids concentrated exposure. Id. Plaintiff is unable to perform complicated tasks and can only engage in simple decision-making. Id. Plaintiff requires a stable work environment in which there are only occasional changes in work settings, tools and procedures. Id. Finally, although plaintiff has the occasional ability to interact with supervisors, co-workers and the public, she has occasional lapses in concentration, persistence, or pace. Id.

In determining plaintiff's RFC, the ALJ is only required to include limitations credibly established by medical evidence and not every limitation alleged. Rutherford, 399 F.3d at 554. Here, the ALJ considered the medical evidence, physicians' opinions, state agency medical consultants, and plaintiff's subjective complaints and made accommodations for them in determining plaintiff's residual functional capacity. The ALJ explained the reasons for giving Mr. Donnelly, Dr. Oyefule, Dr. Marmar and Dr. Rock's opinions little or no weight.

1. Dr. Oyefule

On April 23, 2014, Dr. Oyefule, plaintiff's psychiatrist, drafted a letter in which he stated that plaintiff's "current stress factors in her life have made it impossible for her to function at a normal level including physical health problems." The ALJ rejected this opinion, as it was "contrary to the psychiatrist's contemporaneously recorded treatment notes." (Tr. 30). The ALJ cited the fact that Dr. Oyefule marked plaintiff's impairments as moderate. Id. Specifically, Dr. Oyefule gave plaintiff a global assessment function (GAF) score of 60 on a

March 5, 2014 adult psychiatric evaluation.[1] A GAF score of 60 indicates moderate symptoms or moderate difficulty in social, occupational or school functioning. While we recognize that plaintiff's GAF score was apparently 65 the prior year, indicating mild symptoms, an increase to only moderate symptoms does contradict the severity of plaintiff's symptoms and functional ability as described by Dr. Oyefule in his correspondence less than two months later.[2]

Further, the GAF scores provided by Dr. Oyefule are consistent with other GAF scores in the record. On October 11, 2012, Mr. Donnelly and his supervisor, Christine Torres-Matrullo, completed an Initial Biopsychosocial Assessment and gave plaintiff a current GAF of 60 and a 70 for the past year. (Exhibit 10F at 4; Exhibit 13F at 11). In addition, a treatment plan from Bucks County Mental Health dated January 7, 2015 indicated plaintiff's GAF was 65, indicating mild symptoms. (Exhibit 34F at 2-3).[3]

We also agree with the Commissioner's argument that the state agency medical consultant's findings support a finding of moderate symptoms and limitations. (Exhibit 22F). During a mental status examination, Marged Lindner, Ph.D. found that plaintiff displayed appropriate eye contact, although her motor behavior was slightly restless. Id. Plaintiff's voice was clear and her expressive language was adequate. Id. Plaintiff demonstrated coherent and goal directed thought process with no evidence of hallucinations, delusions or paranoia. Id. Plaintiff also had full affect and appropriate thought content, although she expresses anxiety and some anger at her current situation, along with frequent tearfulness when discussing her history and current limitations. Id. Plaintiff's mood was dysthymic, her sensorium was clear and

1 While the most recent edition of the *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM–V") has discontinued the use of GAF scores, GAF scores remain medical evidence. GAF scores were used by "mental health clinicians and doctors to rate the social, occupational, and psychological functioning of adults."
2 Although Dr. Oyefule indicated on the psychiatric evaluation that plaintiff's GAF score went from a 65 the previous year to a 60 in 2014, records from Dr. Oyefule that predated the March 5, 2014 psychiatric evaluation were not provided.
3 The clinician's signature is illegible. Although Mr. Donnelly and Dr. Oyefule are both providers at Bucks County Mental Health, the clinician's signature on the treatment plan do not match either of their signatures.

plaintiff was oriented. Id. Plaintiff's attention and concentration were intact and her recent and remote memory skills were only mildly impaired. Id. Finally, plaintiff's cognitive functioning was average, her insight was good and her judgment was fair. Id.

In light of the above evidence, we do not believe that the ALJ erred in rejecting Dr. Oyefule's opinion.

2. Joseph Donnelly, M.S.

The ALJ also found that Mr. Donnelly's opinion was not supported by the treatment notes. (Tr. 29). In making this determination, the ALJ relied on testimony from Dr. Braun, a medical expert in psychology, and a review of the medical records. The ALJ explained that Mr. Donnelly's treatment notes and opinions did not correspond to Dr. Oyefule's notes. Id. Specifically, the ALJ noted that while Mr. Donnelly characterized plaintiff's symptoms as "extreme," Dr. Oyefule found plaintiff's symptoms were only moderate. Id. The ALJ also found that "Mr. Donnelly's assertion that the [plaintiff] 'struggles' with memory, concentration, and receptive processing impairment was not observed by [Dr. Oyefule]." Id. We agree that Mr. Donnelly's treatment notes were not consistent with the treatment records as a whole and that the ALJ was, therefore, free to reject Mr. Donnelly's opinion.

The ALJ may choose whom to credit when faced with a conflict, however he "cannot reject evidence for no reason or for the wrong reason." Diaz v. Comm'r of Soc. Security, 577 F.3d 500, 505 (3d Cir. 2009). Although, in general, "the opinions of a doctor who has never examined a patient have less probative force as a general matter, than they would have had if the doctor had treated or examined him," Morales v. Apfel, 225 F.3d 310, 320 (3d Cir. 2000)(internal quotations omitted), where "the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit." Id. at 317,

see also Dula v. Barnhardt, 129 Fed. Appx. 715, 718-19 (3d Cir. 2005). In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may not reject a treating physician's opinion "due to his or her own credibility judgments, speculation or lay opinion." Morales v. Apfel, 225 F.3d 310, 317-318 (3d Cir. 2000) (quotations omitted). Further, when disregarding such an opinion, the ALJ must explain on the record his reasons for doing so. Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986). It cannot be "for no reason or for the wrong reason." Morales, 225 F.3d at 317 (internal quotation marks omitted). At the end of the analysis, however, "[t]he ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and [residual functional capacity] determinations." Chandler, 667 F.3d at 359. "The law is clear . . . that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." Brown, 649 F.3d at 197, n. 2.

As explained above, the ALJ reviewed Mr. Donnelly's treatment notes and did not find his opinions regarding plaintiff's functionality and abilities to be credible in light of the medical evidence as a whole. We find that the ALJ adequately explained his reasoning for rejecting Mr. Donnelly's opinion.

### 3. Joel Marmar, M.D.

The ALJ also rejected Dr. Marmar's opinion due to inconsistencies between Dr. Marmar's physical examination of the plaintiff and his opinion regarding the plaintiff's abilities, and the fact that it appeared that Dr. Marmar did not review the objective medical evidence of record. (Tr. 30). Specifically, the ALJ took issue with the fact that Dr. Marmar found that plaintiff could never reach, handle, finger or feel, despite the fact that "[plaintiff] did not allow examination of her ability to use her hands and fingers." (Tr. 30). Further, the ALJ did not find

Dr. Marmar's opinion credible, due to the fact that Dr. Marmar relied on plaintiff's representation that she had been diagnosed with a cerebral vascular accident and fibromyalgia, without supporting medical evidence. Id. A 2012 MRI showed a "tiny" aneurysm (Exhibit 31F at 11; 16F at 12, 13, 15, 16; 2F at 112, 113) and it was "possible" that plaintiff had a transient ischemic attack in 2014 (Exhibit 31F at 35), however, subsequent neurological examinations, diagnostic studies and a neuro-ophthalmologic examination were all normal. (Exhibit 5F at 3; Exhibit 15F; Exhibit 16F; Exhibit 17F). We agree with the Commissioner's argument that plaintiff has failed to show that her impairment, the possible CVA, "resulted in disabling limitations." See Phillips v. Barnhart, 91 F. App'x 775, 780 (3d Cir. 2004).

With regard to the allegation that plaintiff suffers from fibromyalgia, plaintiff's counsel admits that "[t]here is no indication in the record concerning when she was diagnosed or how." Pl. Brief at 6. Further, we agree with the ALJ that "responses to trigger point testing by [Dr. Marmar] on one occasion do not constitute sufficient evidence to support such a diagnosis pursuant to Social Security Ruling 12-2p."

Accordingly, the ALJ was entitled to reject Dr. Marmar's opinion.

4. Anthony Rock, D.O.

Finally, plaintiff argues that the ALJ erred when he "gave no weight to [Dr. Rock's opinion] because it was a checkmark form and he did not review evidence." Pl. Brief at 3. The ALJ determined that:

> The certification of Dr. Anthony Rock that the [plaintiff] is permanently disabled because of residual effects of cerebral vascular accident lacks substantial probative value. (Exhibit 12F at 5; 36F). As we have seen, there is no evidence that the [plaintiff] had a cerebral vascular accident and no evidence of residual effects of the same. Dr. Rock did not bother to review the medical evidence. He also did not bother to provide a reasoned explanation for the checkmarks he made on a form prepared for him to recommend the [plaintiff] for welfare.

(Tr. 30). As discussed <u>supra</u>, we agree that plaintiff has failed to show that the cerebral vascular accident has resulted in disabling limitations as required by <u>Phillips v. Barnhart</u>, 91 F. App'x 775, 780 (3d Cir. 2004).

Further, we agree with the Commissioner's argument that in the Third Circuit, "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best" and that "where these so-called 'reports are unaccompanied by thorough written reports, their reliability is suspect." <u>Mason v. Shalala</u>, 9945 F.2d 1058, 1056 (3d Cir. 1993); <u>see also</u> <u>Schmidt v. Comm'r of Soc. Sec.</u>, 465 Fed. App'x 193, 197 (3d Cir. 2012); <u>Griffin v. Comm'r of Soc. Sec.</u>, 305 F. App'x 886, 890-91 (3d Cir. 2009); <u>Drejka v. Comm'r of Soc. Sec.</u>, 61 F. App'x 778, 782 (3d Cir. 2003); <u>Acevedo v. Colvin</u>, 2013 WL 6667797 4 (E.D. Pa. Dec. 18, 2013).

Plaintiff has failed to satisfy the burden of showing that the ALJ's decision to reject the opinions of Dr. Oyefule, Mr. Donnelly, Dr. Marmar, and Dr. Rock was not supported by substantial evidence.  The ALJ reviewed the medical evidence of record and determined that when taken as a whole, the treatment records did not support the providers' opinions regarding plaintiff's disability. The ALJ adequately explained the reasons for giving no weight to the opinions offered by Dr. Oyefule, Mr. Donnelly, Dr. Marmar and Dr. Rock.  The ALJ was not bound by the providers' opinions by virtue of the fact that they were treating physicians.  The ALJ was required to make the ultimate disability and residual functional capacity determinations, and the fact that the ALJ's findings contradicted plaintiff's providers' opinions does not mean that those findings lacked substantial support. As such, plaintiff' request for review is denied as to this issue.

B.  <u>Claim Two: Whether the ALJ's Step Five Determination is Supported by Substantial Evidence</u>

Plaintiff argues that the ALJ erred in the Step Five determination regarding plaintiff's ability to adjust to other work. Pl. Brief at 8-10. Specifically, plaintiff argues that her mental impairments cause her to be off task for 30% of the workday, and that she is therefore, unable to work. Id. Plaintiff points out that "occasional" as defined by the Social Security Administration means "occurring from very little up to one-third of the time." SSR 83-10. Plaintiff encourages us to assume that occasional lapses in concentration occur 30% of the time—the higher end of "occasional." Further, plaintiff argues that the vocational expert testified that given the limitation added to the RFC to account for plaintiff's occasional lapses in concentration, that there are no jobs in the national economy to which she could adjust. We disagree with this characterization of the testimony. While the vocational expert initially testified that there would be no jobs in the national economy to accommodate plaintiff's lapses in concentration, the ALJ appropriately clarified and corrected the vocational expert's understanding of the term "occasionally."

> [ALJ]: All right. So I'm going to give you the following hypothetical, which will be hypothetical #2. Here, assume if you will, that someone can perform light exertion, standing and walking for a total of two hours in an eight-hour day. Push and pull would be limited to occasionally with the lower extremities. Climb stairs and/or ramps, occasionally. Ladders, ropes, scaffolds, never. Balance, occasionally with one cane. Stoop occasionally. Kneel occasionally. Crouch, never. Crawl, never. Reach, handle, finger and feel would all be frequently. Must avoid concentrated exposure to temperature extremes, heights, vibration and hazardous machinery.
>
> .    .    .
>
> [ALJ]: …I'm also going to give you the following mental limitations. No complicated tasks. Simple decision-making only. Requires a low, stable work environment in which there are no more than occasional changes in work settings, tools and procedures. Occasional ability to interact with supervisors, coworkers and the public. And must avoid concentrated exposure, no, and occasional lapses in concentration, persistence or pace. Do you have all those assumptions, Ms. Shallo –Shullo, I'm sorry?
>
> [VE]: Yes, Just to double check, standing and walking was only two hours?

[ALJ]: Correct.

[VE]: Was there a sitting limitation?

[ALJ]: No, well, in accordance with light exertion there would be six hours of sitting out of eight. Anything else that you wish to know?

[VE]: Yes. Just to double check, standing and walking was only two hours?

[ALJ]: Correct.

[VE]: Was there a sitting limitation?

[ALJ]: No, well, in accordance with a light exertion there would be six hours of sitting out of eight. Anything else that you wish to know?

[VE]: No, your honor.

.     .     .

[ALJ]: All right. So the question I have for you now, would there be any jobs that could accommodate those assumptions?

[VE]: Your Honor, with those assumptions, the sitting six hours and the standing and walking for two hours, this person will be restricted to sedentary work?

[ALJ]: Correct.

[VE]: And the occasional inability to maintain concentration and persistence and pace, occasional will be in the form of 30% based on that the first [INAUDIBLE] being off task at a month's time, there will be no jobs in the national economy.

[ALJ]: But isn't it correct that the Department of Labor defines occasional specifically? Am I correct?

[VE]: Yes.

[ALJ]: And it defines it as intermittently up to one-third of a day. Is that correct?

[VE]: That is correct.

[ALJ]: In fact, the Department of Labor does not use 30%. People extrapolate that from the fact that it says intermittently up to one-third of the day.

[VE]: That is correct.

[ALJ]: Okay. Well, with that clarification, would there be any jobs?

[VE]: At the sedentary exertional level the position as an adjuster. That is an unskilled position, SVP of 2. National numbers are 60,000.

(Tr. 92-95). While we believe the testimony speaks for itself, following this exchange, the vocational expert proceeded to identify additional jobs that would fit the hypothetical provided by the ALJ, that the plaintiff, by extension, would be capable of performing. Therefore, we find that when taken as a whole, the vocational expert's testimony does not contradict the RFC as determined by the ALJ. Accordingly, this claim is denied.

An order follows:

[Court Note: Heather MacGillivray, Esquire, significantly contributed to the research and preparation of this Report and Recommendation.]